UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
AZHAR ALI KHAN, *et al.*,          )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )
                                   )       Civil Action No. 03-1574 (RCL)
PARSONS GLOBAL SERVICES, LTD.,     )
*et al.*,                          )
                                   )
          Defendants.              )
_____)

## MEMORANDUM OPINION

### I.    INTRODUCTION

This matter comes before the Court on the defendants' motion [31] to compel arbitration.
This case was originally brought before this Court in 2003 by way of removal of the case from
the Superior Court of the District of Columbia.  Defendants removed this case to this Court
pursuant to 9 U.S.C. § 205, the Federal Arbitration Act ("FAA"), on the ground that the case
"relates to an arbitration agreement or award falling under the Convention [on the Recognition
and Enforcement of Foreign Arbitral Awards]."[1]  After removing the case, defendants filed a
motion [4] seeking either to dismiss or to obtain summary judgment on the grounds of workers'
compensation exclusivity or, in the alternative, to compel arbitration pursuant to the NY
Convention.  (*See* Mot. [4].)  Plaintiffs opposed this motion, arguing that the arbitration
agreement was unconscionable under California law and therefore unenforceable, and contending

_____

[1] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10,
1958, 21 U.S.T. 2517, T.I.A.S. No. 6997; reprinted following 9 U.S.C. §§ 201-08 (1983 Supp.)
[hereinafter "NY Convention"].

that the workers' compensation law did not bar plaintiffs' claims.  In a March 22, 2004, Order [15], the Court granted the defendants' motion for summary judgment, finding that the workers' compensation law was the exclusive remedy for plaintiffs.  In that same Order, the Court denied the motion to compel arbitration as moot.  Plaintiffs appealed this Court's decision to the D.C. Circuit.

On appeal, the D.C. Circuit reversed this Court, finding that Mr. Khan did not properly fall within the "traveling employee" category within the workers' compensation law.  *Khan v. Parsons Global Services, Ltd.*, 428 F.3d 1079, 1084-85, 1087 (D.C. Cir. 2005).  Therefore, the Court of Appeals found that there was no workers' compensation exclusivity.  *Id.* at 1087.  The D.C. Circuit did not rule on the issue of the applicability of the arbitration clause.  *Id.* at 1087-88. Upon issuance of the mandate from the Court of Appeals, this Court issued a scheduling order [30] directing the parties to brief the issue of whether the claims at issue should be submitted to arbitration.

In response to this scheduling order, defendants filed a motion to compel arbitration [31] and a memorandum [32] in support thereof, on April 17, 2006.  Plaintiffs filed their memorandum in opposition to the motion [34] on May 8, 2006, and defendants' reply memorandum [35] was filed ten days later.

Within their pleadings, the parties have four issues for this Court to consider.  First, the Court must determine whether defendants waived their right to compel arbitration by filing its motion to dismiss or for summary judgment on grounds of workers' compensation exclusivity or in the alternative to compel arbitration.  Second, if the Court decides that the defendants did not waive their right to compel arbitration, the Court must determine whether the arbitration clause at

2

issue in this case is enforceable.  This determination carries with it a consideration of whether

state or federal law governing enforceability of an arbitration agreement applies, and whether or

the arbitration clause is unconscionable under the applicable law.  Third, the Court must then

assess whether the arbitration clause applies equally to signatories and non-signatories in this

case, and which claims brought by or against parties fall within the scope of the arbitration

agreement.  Finally, the Court must determine whether it should compel discovery concerning the

alleged unconscionability of the arbitration clause.

## II.     DISCUSSION

### A.     Waiver

In this Circuit, the right to compel arbitration can be waived by a party.  *National*

*Foundation for Cancer Research v.  A.G. Edwards & Sons, Inc.*, 821 F.2d 772, 774 (D.C. Cir.

1987) (citing *Cornell & Co.  v.  Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966).  The

test for determining whether a party has waived its right to arbitration is "whether, under the

totality of the circumstances, the defaulting party has acted inconsistently with the arbitration

right."  *National Foundation*, 821 F.2d at 774 (citing *Cornell*, 360 F.2d at 513).  If the Court is

faced with any ambiguity with regard to the scope of the waiver, the Court must resolve the

ambiguity in favor of arbitration.  *Moses H. Cone Memorial Hospital v. Mercury Construction*

*Corp.*, 460 U.S. 1, 24-25 (1983).  Because this type of determination is one concerning the

arbitrability of a claim, the issue of waiver of right to arbitrate should be decided by the Court,

not an arbitrator, according to federal law.  *See id.* (stating that issues of waiver are resolved "as a

matter of federal law").

One method of determining whether such a right to arbitrate has been waived is to

ascertain whether or not the party "actively participates in a lawsuit." *Cornell*, 360 F.2d at 513.

In *Cornell*, the Court was faced with a party that, prior to filing its motion to compel arbitration, moved to transfer venue to a different federal district, filed both an answer to the plaintiff's complaint as well as its own counterclaim, and engaged in definitive discovery. *Id.*[2] The circuit court affirmed the district court's finding that "[t]he litigation machinery had been substantially invoked," and that the defendant's conduct constituted a waiver of its right to arbitrate. *Id.* at 513-14.

The D.C. Circuit was faced with a similar situation in *National Foundation*. In that case, the defendant first filed an answer, in which it asserted fifteen assertive defenses, and failed to mention arbitration at all. *National Foundation*, 821 F.2d at 775. In addition, the defendant "instigated extensive discovery," including deposing six of the plaintiff's officers, directors and employees, and providing its own employees to be deposed by the plaintiff. *Id.* As if this were not enough, the defendant opposed the plaintiff's motion to amend the complaint, answered the amended complaint with no mention of arbitration, until finally moving for complete summary judgment on a majority of the counts in the amended complaint, and partial summary judgment on the remaining counts. *Id.* After briefing and oral argument on the summary judgment issue, settlement negotiations between the parties began, and it was only at this point that the defendant moved to compel arbitration. *Id.* In upholding the district court's finding of waiver due to active participation in the lawsuit, the D.C. Circuit found that the defendant's conduct prior to invoking the arbitration provision "invoked the litigation machinery to an even greater extent" than the

---

[2] The defendant's discovery activity included filing notice of depositions, taking the deposition of an official of the plaintiff, and procuring the production of various records and documents. *Id.*

defendant in *Cornell*.  *National Foundation*, 821 F.2d at 775.  The defendant's activity "was wholly inconsistent with an intent to arbitrate and constituted an abandonment of the right to seek arbitration." *Id.* at 776.  Allowing the defendant the opportunity to arbitrate these issues after its immersion in the trial mechanism would "squarely confront[] the policy that arbitration may not be used as a strategy to manipulate the legal process." *Id.*

In a case before this District Court, Judge Harris was also faced with an issue of waiver of the right to compel arbitration in a contract dispute case.  *See Gordon-Maizel Constr. Co. v. Leroy Prods., Inc.*, 658 F. Supp. 528 (D.D.C. 1987).  In *Gordon-Maizel*, the general contract executed by the parties included a broad arbitration clause.  *Id.* at 530.  Plaintiffs filed an action in this District Court seeking to enforce liens they had obtained against the defendants for outstanding contract payments.  *Id.*  In their answer, defendants raised arbitration as an affirmative defense, then asserted counterclaims against plaintiffs seeking to vacate the liens, compel arbitration of the contract dispute, and recover damages for fraudulent filing of the mechanic's liens.  *Id.*  Relying upon this evidence, Judge Harris found that the defendants had not waived their right to compel arbitration.  *Id.* at 531.  Accordingly, Judge Harris held that "[a]bsent substantial delay in asserting the contractual right to arbitrate, or other prejudicial conduct on the part of [the defendants], a finding of waiver would be inappropriate." *Id.* (citing *Fisher v. A.G. Becker Paribus, Inc.*, 791 F.2d 691, 694 (9th Cir. 1986); *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 889 (2d Cir. 1985)).

The Court takes from these cases three propositions.  First, the filing of a motion for summary judgment does not automatically necessitate a finding of "active participation in a

lawsuit."[3]  Second, a party actively participates in a lawsuit if, under the totality of the circumstances, the party has undertaken efforts to utilize the judicial system to dispute the opposing party's claims on their merits.  Third, with regard to the timeliness of a defendant's invocation of its right to arbitrate, a defendant does not waive its right to invoke arbitration unless there is a substantial delay in asserting this right.  Considering plaintiffs' claims of waiver against this background, the Court finds that the defendants' conduct does not rise to the level of "active participation" found in either *National Foundation* or *Cornell*, and that, therefore, the defendants did not waive their right to compel arbitration.

A number of reasons support this decision.  First, contrary to the defendants in the aforementioned cases, the defendants in the present case did not engage in any discovery at all before filing their initial response with this Court.  Plaintiffs concede this, and the D.C. Circuit pointed out that this case was resolved without discovery.  *Khan*, 428 F.3d at 1087.

Second, defendants did not delay in invoking their right to arbitrate the matters in this case.  To the contrary, defendants invoked arbitration from the outset of this case.  After this case was filed by the plaintiffs in the Superior Court for the District of Columbia, defendants removed the case to this Court pursuant to 9 U.S.C. § 205, on the ground that the case "relates to an arbitration agreement or award falling under the [NY] Convention."  Additionally, on July 21, 2003–more than a week *prior* to filing its motion [4] to dismiss, etc.–counsel for defendants sent

---

[3] Though *National Foundation* involved a case where the defendant had filed for summary judgment, the holding of the case indicates that the motion for summary judgment was only one of many other factors considered in reaching a finding of waiver.  *See National Foundation*, 821 F.2d at 778 (finding waiver of right to compel arbitration "in light of appellant's delay in seeking arbitration, its extensive involvement in pretrial discovery, its invocation of summary judgment procedures, and the resulting prejudice to appellee . . .").

a letter to counsel for plaintiffs requesting that plaintiffs dismiss this action and pursue their claims against the defendants by way of arbitration, in accordance with the arbitration agreement within Mr. Khan's employment contract.  Further, defendants moved alternatively to compel arbitration as a means of resolving this dispute when they filed their motion to dismiss or for summary judgment or to compel arbitration.  This Court found that the District of Columbia workers' compensation statute necessitated a dismissal of the case, and reached this decision prior to reaching the merits of whether the matter should be submitted to arbitration, an issue that was fully briefed by both parties.

Third, the defendants' motion did not undertake efforts to dispute the plaintiffs' claims on their merits.  Though the Court resolved the defendants' motion by treating it as one for summary judgment, the main purpose of defendant's motion was to dismiss the claims on Rule 12(b)(6) grounds that plaintiffs had failed to state a claim for which relief could be granted.[4]  Specifically, defendants' argument was that the plaintiffs' claims should be dismissed because the D.C. workers' compensation law provided the exclusive remedy for plaintiffs.  Defendants' motion was converted to a summary judgment motion by the Court as required by Rule 12(b) because the Court considered material outside the pleadings in resolving the motion.  *See* Fed. R. Civ. P. 12(b) (stating that if matters outside the pleadings are considered by the court on a Rule 12(b)(6) motion to dismiss, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .").  By their very nature, Rule 12(b) motions to dismiss made *prior* to

---

[4] As defendants' motion shows, the defendants sought to dismiss this claim on Rule 12(b)(6) grounds.  Summary judgment was raised by defendants as an optional means of resolution of this dispute only if the Court should "deem it necessary to consider additional matters outside the pleadings," as required by Rule 12(b) of the Federal Rules of Civil Procedure. (Mot. [4], at 6.)

filing an Answer to the Complaint are designed to effectively *prevent* litigation of issues on the

grounds that those issues might be decided in the predicate as a matter of law.  It would offend

logic to penalize a party for filing a motion designed to preclude litigation by preliminarily

dismissing improper claims at the onset of an action simply because the parties incurred later

costs by arguing the grounds for dismissal on appeal.  In that vein, other courts have found that

the filing of a motion to dismiss does not constitute a waiver of a party's right to compel

arbitration.  *See Rush v. Oppenheimer & Co.*, 779 F.2d 885, 888 (2d Cir. 1985) (citing *Sweater*

*Bee By Banff, Ltd. v. Manhattan Industries, Inc.*, 754 F.2d 457, 463 (2d Cir. 1985)).  Similarly, in

this case, the defendants took, in essence, what was a "protective step of filing a motion to

dismiss" by filing its pre-answer motion.  *Rush*, 779 F.2d at 888.  The fact that this Court

converted the motion to one for summary judgment should not be held against the defendants.[5]

Fourth, there is no evidence that plaintiffs would be prejudiced by submitting the dispute

to arbitration.[6]  Plaintiffs' claims of unconscionability notwithstanding, notions of prejudice in

the context of waiver of a right to arbitrate do not speak to issues of whether the arbitration

clause itself is unconscionable.  Rather, notions of prejudice in a waiver context speak directly to

---

[5] Even if such a fact were to be held against compelling arbitration, two facts undermine this position.  First, as the Court has previously stated, there is no strict requirement" within this Circuit that a motion for summary judgment constitutes *per se* "active participation" in a lawsuit. *See supra* note 3, and accompanying text.  Second, at the very least, the motion to dismiss seeking in the alternative to move for summary judgment or to compel arbitration is an ambiguous act, which must be resolved in favor of arbitration.  *Moses H. Cone*, 460 U.S. at 24-25.

[6] As the D.C. Circuit has stated, though the Court is not required to find a showing of prejudice in order to establish that the party seeking arbitration waived its right to arbitrate, it may certainly consider whether prejudice exists in resolving an issue of waiver.  *National Foundation*, 821 F.2d at 777.

the issue of whether the party seeking arbitration has directly caused substantial expense and loss of time to the non-moving party by substantially [invoking] the litigation process instead of demanding arbitration. *National Foundation*, 821 F.2d at 777 (citing *Miller Brewing Company v. Fort Worth Distributing Co.*, 781 F.2d 494, 497 (5th Cir. 1986) (finding prejudice where a party actively engaged in pre-trial discovery procedures by taking a number of depositions). As noted above, however, the defendants engaged in no pre-trial discovery, and sought dismissal of the case as a matter of law prior to filing an answer. Any additional costs incurred by the plaintiffs in arguing the terms of this dismissal on appeal were brought about by the plaintiffs.

Finally, this rationale ultimately best comports with the strong federal policy favoring arbitration.[7] To hold otherwise would effectively allow plaintiffs in any case to avoid arbitration by bringing frivolous claims or claims not recognized at law against the defendant, who would be forced to immediately move to compel arbitration of those spurious claims, else waive their right to compel arbitration altogether.

Accordingly, the Court finds that the defendants did not waive their right to compel arbitration. The Court must now turn its attention to whether it must compel arbitration in light of the arbitration clause set forth in the assignment agreement.

B.    *Issue of Whether Court Should Compel Arbitration*

The next issue before the Court is whether the Court should compel arbitration of the claims before it. This matter comes before the Court upon a motion to compel pursuant to Chapter Two of the Federal Arbitration Act ("FAA").

---

[7] *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.").

Plaintiffs ask this Court to find that the Court should not compel arbitration of the claims at issue because it asserts that the arbitration agreement is unconscionable, and therefore unenforceable.  Citing *Volt Info. Sciences, Inc. v. Bd. of Trustees*, 489 U.S. 468, 479 (1989), plaintiffs assert that "parties are generally free to structure their arbitration agreements as they see fit."  Therefore, they argue that, to the extent that the parties have contracted to abide by a particular set of rules set forth in the arbitration clause, enforcing those agreed-upon terms "is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward."  *Id.*  To that end, plaintiffs contend that the California choice-of-law provision in Mr. Khan's employment contract[8] evidences the parties' express agreement that the standards of enforceability under California law should govern this agreement.  Plaintiffs' position is that this choice-of-law provision has a preclusive effect to the applicability of the FAA and NY Convention to the contract, and to consider the framework of federal arbitration law before considering the applicable state law set forth in the arbitration agreement would "put[] the cart before the horse."  Moreover, even if federal law does apply, plaintiffs assert that the arbitration agreement is still unconscionable under federal law because unconscionability fits within the definition of "null and void" under Article II(3) of the NY Convention.  Therefore, plaintiffs claim that the arbitration agreement at issue is unenforceable, and that this Court must hear their claims against the defendants.

Defendants, by contrast, argue that federal law must be consulted at the outset without regard to state law because, as the FAA and NY Convention state that *any* agreement meeting the

---

[8] The arbitration clause specifically states that "[i]n, and in respect of, such arbitration, the Laws of the State of California, USA shall apply to and govern this Agreement, its interpretation, and performance."

10

requirements of 9 U.S.C. § 202[9] "falls under the [NY] Convention," within which there exists a

strong presumption in favor of compelling arbitration.  9 U.S.C. § 202.  Looking to the NY

Convention, defendants argue that this Court may not honor an arbitration agreement in only a

limited set of circumstances, including whether the arbitration agreement is "null and void" under

Article II(3) of the NY Convention.  Again, defendants assert that the determination of whether

an arbitration agreement is null and void should be determined as a matter of *federal* law,

notwithstanding the California choice-of-law provision, because federal law preempts state law

with respect to issues of enforceability of arbitration agreements under the NY Convention.

Therefore, defendants argue that plaintiffs' assertion that the arbitration agreement is

unconscionable under California law must fail.  Moreover, defendants argue that the defense of

unconscionability does not exist under federal law in cases involving arbitration agreements

falling under the NY Convention because unconscionability is not a defense that can be

uniformly applied on an international scale.  *See Ledee v. Ceramiche Ragno*, 684 F.2d 184, 187

(1st Cir. 1982) (citing *I.T.A.D. Associates, Inc. v. Podar Brothers*, 636 F.2d 75 (4th Cir. 1981).

Under this rationale, defendants argue that the arbitration agreement must be enforced, and that

the claims must be submitted to arbitration pursuant to the arbitration agreement between the

parties.

These arguments present the Court with two distinct inquiries.  First, the Court must

determine whether the arbitration agreement's indication that California law shall govern usurps

---

[9] To wit: (1) agreement in writing; (2) arbitration in the territory of a NY Convention
signatory; (3) agreement arises out of a commercial legal relationship; and (4) at least one party
to the agreement is not an American citizen.

the application of the NY Convention and its interpretation.[10]  Specifically, did the parties, by

including the California choice-of-law clause, intend for California law to govern the

enforceability of the arbitration agreement, effectively opting out of the enforceability tenets

found under federal law?  Second, once the Court has determined which law to apply, the Court

must then assess whether the arbitration agreement is unconscionable–and therefore

unenforceable–under that law.

> 1.    Should Federal or State Law Govern the Enforceability of this Arbitration
>        Agreement?

As this Court stated earlier, arbitration is generally a matter of federal law.  *See* 9 U.S.C.

§ 2, 201; *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (stating that Congress

enacted the FAA "to overcome courts' refusals to enforce agreements to arbitrate").  Under the

FAA and NY Convention, a strong pro-arbitration policy exists.  *See Mastrobuono v. Shearson

Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995).  Notwithstanding this pro-arbitration policy, the

United States Supreme Court has recognized that issues of enforceability of an arbitration

agreement should be considered in light of the wishes of the contracting parties.  *See id.*; *Volt*,

489 U.S. at 479.  Therefore, if the parties contract to arbitrate pursuant to other rules or

procedures borrowed from state law, this pro-arbitration policy is satisfied so long as the

---

[10] To be clear, though the parties have, to a degree, framed this issue as one of preemption, the issue in this case is not a matter of preemption.  Were this a matter of simple preemption, there would be no question that federal law would apply because the FAA governs any "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . ."  9 U.S.C. § 2.  As the United States Constitution states, a valid federal law preempts those state laws that purport to regulate the same issue.  *See* U.S. Const. Art. VI.  But rather, as the Supreme Court has found, arbitration is a matter of contract.  Therefore, the issue before the Court is a matter of contract construction.

agreement is enforced.  *Id.* at 478.

Still, as the Supreme Court noted in *Mastrobuono*, a choice-of-law clause invoking state law does not amount to an indication that the parties intended to opt out of the federal default rules unless the parties clearly evidence such an intent to opt out.  *See Mastrobuono*, 514 U.S. at 60.  In *Mastrobuono*, a securities broker and two of its customers entered into an agreement to resolve any disputes by arbitration, and indicated that the agreement was "governed by the laws of the State of New York."  The customers sought punitive damages against the broker; punitive damages *are* allowed under the FAA.  The broker argued that the arbitration agreement invoked New York law, and that under New York law, punitive damages were not allowed.  Therefore, the Supreme Court had to decide whether the parties intended to incorporate into their agreement the New York rule barring punitive damages, effectively opting out of the FAA stance allowing punitive damages.  Though the Court acknowledged that parties were certainly free as a matter of contract to consent to opt out of the federal standards under the FAA, the general choice of law clause invoking New York state law was "not, in itself, an unequivocal exclusion of punitive damages claims."  *Id.*  At most, the choice-of-law clause "introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards."  *Id.* at 62.

Following *Mastrobuono*, the Third Circuit held that generic choice-of-law clauses do not, on their own, support a finding that the parties intended to opt out of specific default standards under federal law.  *SeeRoadway Package System, Inc. v. Kaiser*, 257 F.3d 287, 296 (3d Cir. 2001).  Other Courts of Appeals have reached a similar result.  *See PaineWebber, Inc. v. Elahi*, 87 F.3d 589, 594 n. 5 (1st Cir.1996); *National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 134 (2d Cir.1996); *Porter Hayden Co. v. Century Indemnity Co.*, 136 F.3d 380, 383

n.6 (4th Cir.1998); *Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 936 (6th Cir.1998); *UHC*

*Management Co., Inc. v. Computer Sciences Corp.*, 148 F.3d 992, 996 (8th Cir.1998); *Wolsey,*

*Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1212-13 (9th Cir.1998).[11]

Having considered *Mastrobuono* and cases following its rationale, this Court reaches the

following conclusions. First, if an arbitration agreement meets the requirements of either the

FAA or NY Convention, then those federal standards are the default standards that a court must

apply, even in the face of a general choice-of-law provision. Second, a Court may consider other

rules or procedures under state law, provided there is clear and convincing evidence that the

parties intended those particular rules or procedures under state law to apply and usurp the

default federal standards. Third, a generic choice-of-law clause, by itself, is insufficient evidence

to prove that the parties intended to opt out of the default federal standards.

In this case, there is no evidence beyond the choice-of-law clause itself that the parties

intended for California's rules of enforceability as to arbitration agreements to govern this

agreement. The contract was made between a United States corporate entity with a British

citizen of Indian descent. The contract encompassed Mr. Khan's employment functions, which

were obviously of an international nature, as his job duties took him abroad. As the Complaint

---

[11] These decisions also conclude that *Volt* is inapposite to decisions on whether a generic choice-of-law provision should be interpreted, as the Supreme Court was under an obligation in *Volt* to defer to state court constructions of private agreement outside of a federal law context. *Cf. Mastrobuono*, 514 U.S. at 60 (stating that the *Volt* Court did not construe the contract at issue *de novo*, but rather that it "deferred to the California court's construction of its own state law"). For this reason, the above-listed Courts of Appeals found that the holding in *Mastrobuono* is not inconsistent with *Volt*, and that *Mastrobuono* provides the most appropriate test to determine the applicability of a generic choice-of-law clause invoking state law in a case invoking federal arbitration issues. *See* Various cases listed *supra*, accompanying this footnote. This Court agrees with the rationale of these Courts of Appeals.

states, from 1996 until 2000, Mr. Khan was on assignment in Kuala Lumpur, Malaysia, where

his wife lived with him.  During that time, Mr. Khan also made work trips to Bangkok, Thailand.

Then, in 2001, Mr. Khan was assigned to work in Manila, Phillippines, where he was ultimately

kidnaped.  In all respects, the contract and relationship between the parties was an international

one.[12]  Accordingly, because there is no evidence–let alone clear and convincing evidence–that

the parties intended for California law to govern the enforceability of the arbitration agreement at

issue instead of the NY Convention, the Court finds that the default federal rules, in this case, the

FAA and NY Convention, shall govern the enforceability of this arbitration agreement.[13]

       2.      Applying Federal Law

Chapter Two of the FAA carries out the United States' adoption of the NY Convention.

*See* 9 U.S.C. § 201 (stating that the NY Convention "shall be enforced in United States courts in

accordance with this chapter").  An arbitration agreement is governed by the NY Convention if:

---

[12] The only domestic connection with between the parties and the agreement, is the fact that the defendants are incorporated in Washington, DC, and that they engaged in telephone calls from Washington, DC abroad during the course of the hostage negotiations.

[13] The Court recognizes that the D.C. Circuit found in *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391 (D.C. Cir. 1995), that a generic choice-of-law clause invoking Connecticut state law dictated that the parties intended for Connecticut's limitation period to apply.  The D.C. Circuit's decision in *Ekstrom*, however, is distinguishable from the present case for three reasons.  First, the decision was based solely upon the Supreme Court's decision in *Volt*.  It was made without reference to, or consideration of, *Mastrobuono*, which by the Supreme Court's own admission in that case, significantly limits the holding in *Volt* as far as determining the applicability of a generic choice-of-law clause in the context of federal law.  *See Ekstrom*, 68 F.3d at 1395.  Second, the decision to apply state law in *Ekstrom* was made within the context of preemption, which does not apply in this case.  *See id.*  Finally, the D.C. Circuit's decision was based in part upon the fact that a "reasonable relationship" existed between Connecticut law and the parties' dispute.  In the present case, by contrast, there is absolutely no connection or relationship between the parties' dispute and California.  Therefore, the Court finds that the D.C. Circuit's holding in *Ekstrom* is inapposite to the determination made in this case.

(1) there is a written agreement between the parties to arbitrate the dispute; (2) the locus of the arbitration is in a country that is a signatory to the NY Convention; (3) the dispute arises out of a commercial legal relationship; and (4) at least one party to the arbitration agreement is not an American citizen.  *See* 9 U.S.C. § 202; NY Convention, Art. II(3); *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 273 (5th Cir. 2002).  Once a court finds that the arbitration agreement falls under the NY Convention, it is compelled to order arbitration unless it finds that the arbitration agreement itself is "null and void, inoperative or incapable of being performed." NY Convention, Art. II(3).

According to the facts of the case, the NY Convention should govern the agreement, as the elements necessary to satisfy invocation of the NY Convention have been met.  There was an agreement in writing to arbitrate the dispute.  The agreement provided for arbitration in Switzerland, which is a signatory to the NY Convention.  The agreement arises out of a commercial legal relationship because it stems from an employment contract, where services are provided by the employee in exchange for monetary payments.  Mr. Khan, a party to the agreement, is not an American citizen, as he is a British citizen of Indian descent.  Therefore, the Court must now determine whether the arbitration agreement is "null and void, inoperative or incapable of being performed" under Article II(3) of the NY Convention.[14]  More specifically, the

---

[14] The terms of the arbitration agreement state "any controversy or claim aris[ing] out of this Assignment Agreement or the breach hereof or in any other way related hereto or otherwise related to or arising out of" Mr. Khan's employment with the company "shall be settled exclusively by arbitration . . . ." July 22, 2003 Decl. of Carlos A. Munoz.  As the Second Circuit Court of Appeals has found, a clause providing for the arbitration of any claim or controversy *arising out of or relating to* the agreement is "the paradigm of a broad clause."  *Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).  Therefore, the Court finds that the language of this arbitration agreement is sufficiently broad as to encompass all of the allegations set forth in the Complaint.  Therefore, the allegations are all governed by the

Court must determine whether the "null and void" language in Article II(3) includes the defense of unconscionability.

Federal courts have consistently found that the "null and void" language in Article II(3) is to be narrowly construed. *Riley v. Kingsley Underwriting Agencies*, 969 F.2d 953, 960 (10th Cir. 1992) (citing *Rhone Mediterranee Compagnia v. Lauro*, 712 F.2d 50, 53 (3d Cir. 1983); *see also Ledee*, 684 F.2d at 187; *Meadows Indem. Co. v. Baccala & Shoop Inc.*, 760 F. Supp. 1036, 1043 (E.D.N.Y. 1991)). "The 'null and void' language *must* be read narrowly, for the signatory nations [to the NY Convention] have jointly declared a general policy of enforceability of agreements to arbitrate." *Rhone*, 712 F.2d at 53 (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 507 n.10 (1974)).   Thus, to remain consistent with the overall purposes of the NY Convention, the "null and void" clause should only apply when (1) it is subject to an internationally recognized defense such as duress, mistake fraud or waiver, *see Rhone*, 712 F.2d at 53 (citing *Ledee*, 684 F2d. 184; *I.T.A.D. Assoc. Inc. v. Podar Brothers*, 636 F.2d 75 (4th Cir. 1981), or (2) when it contravenes fundamental policies of the forum state. *Rhone*, 712 F.2d at 53.

The First Circuit in *Ledee* interpreted "null and void" to encompass "those situations such as fraud, mistake, duress and waiver" that might be applied neutrally on an international scale. *See* 684 F.2d at 187 (*citing* I.T.A.D., 636 F.2d 75).  In making such an interpretation, the First Circuit sought to harmonize their conclusions with those of the Second and Third Circuits, which had made previous interpretations of the NY Convention and the Chapter Two of the FAA.  *See Ledee*, 684 F.2d at 187 n.10 (citing *see Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de l'Industrie du Papier (RAKTA)*, 508 F.2d 969, 973-74 (2d Cir. 1974); *McCreary*

NY Convention.

17

*Tire & Rubber Co. v. CEAT*, 501 F.2d 1032 (3d Cir. 1974)).  The *Ledee* court sought to continue

the narrow construction of defenses based upon "public policy,"[15] and ensure that there remains

"nothing discretionary" about Article II(3).  *See Ledee*, 684 F.2d at 187 n.10 (citing *McCreary*,

501 F.2d 1032).  Thus, the federal case precedent is clear that, while public policy and discretion

of the courts may be a predominant characteristic of domestic arbitration, international arbitration

requires *certaint*y to ensure unified standards by which agreements to arbitrate are observed and

arbitral awards are enforced.  *See Rhone*, 712 F.2d at 53-54 (explaining the principal purpose

underlying the American adoption of the NY Convention).

By its very nature, the defense of unconscionability seeks to promote those very tenets

that are contrary to a finding of certainty, namely: policy, fairness, and appeals to a court's

discretion outside of the letter of the law.  Therefore, in light of this foundation, this Court finds

that unconscionability is *not*–and indeed *cannot* be–a recognized defense to the enforceability of

arbitration agreements falling under the NY Convention.  Accordingly, the Court finds that,

under federal law, plaintiffs' argument that the arbitration agreement is unconscionable must fail.

Therefore, the arbitration agreement between the parties must be enforced, pursuant to Article

II(3) of the NY Convention.

C.      *Non-Signatories*

The next issue the Court must decide is whether the arbitration clause is enforceable

against the remaining non-signatory parties in this case.  Defendants argue that the arbitration

agreement should be enforceable by the non-signatory defendants.  Plaintiffs argue that the

arbitration agreement may not be enforced by, or against, any non-signatories.  They claim that

---

[15] *See Ledee*, 684 F.2d at 187 n.10 (citing *Parsons* 508 F.2d at 973-74).

the arbitration agreement solely governs "the claims between 'the Employee' (Mr. Khan) and 'the Company' (PGSL)" and has "*nothing to do*" with any other claims against the defendants by either Mr. or Mrs. Khan.   Plaintiffs argue that a non-signatory seeking to enforce an arbitration clause against a non-signatory is not permissible under California law.   As this Court has already found, however, the introduction of California law into the arbitration agreement at issue was not intended to usurp the federal standards of enforceability under either the FAA or the NY Convention.   Accordingly, the Court will decide this issue as a matter of federal law.

The applicability of an arbitration agreement to non-signatories is a matter of first impression in this Circuit, however the Second Circuit has readily addressed this issue.   As the Second Circuit has noted, there are five agency and contract law theories under which a non-signatory may be compelled to arbitrate a claim: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.   *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).   In this case, the Court finds that the non-signatory Parsons defendants and Mrs. Khan are bound by the arbitration clause under the doctrine of estoppel.

Plaintiffs assert that the arbitration clause does *not* apply to the non-signatory Parsons defendants at all, as they are not signatories to the employment contract containing the arbitration agreement.   As the Second Circuit points out, however, courts have been "willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."   In this case, plaintiffs allege claims of both negligence and intentional infliction of

19

emotional distress against *all* of the defendants.[16]  The negligence claims allegedly arise out of a duty that plaintiffs claim "each of the defendants" breached.  As there does not appear to be any other relationship between the parties, this duty, presumably arises from Mr. Khan's employment with the defendants. Accordingly, the negligence claims the non-signatory Parsons defendants are trying to resolve must be intertwined with the employment agreement (and arbitration agreement therein) because the claims against those defendants arise directly from that agreement.  Moreover, the intentional infliction of emotional distress claims are also intertwined with the employment agreement because, to the extent that the defendants' actions harmed the plaintiffs, those actions were undertaken in their role as Mr. Khan's employer or its agents. Therefore, the arbitration agreement may be enforced by all of the non-signatory Parsons defendants as to all claims against them.

Mrs. Khan argues that she should not be subjected to binding arbitration as she was neither a signatory or a third-party beneficiary of the employment contract containing the agreement.  Still, courts have found that where one spouse is not a signatory to a contract containing an arbitration clause, if the non-signatory spouse's claims are so intertwined with the signatory spouse's claims, and are so dependent upon a contract containing an arbitration clause, then both spouses were equitably estopped from avoiding arbitration.  *See Fluehmann v. Associates Financial Services*, 2002 WL 500564 (D. Mass. 2002); *LaSonde v. CitiFinancial Mortg. Co., Inc.*, 614 S.E.2d 224 (2005); *In re Weekley Homes, L.P.*, 180 S.W.3d 127 (Tex.

---

[16] Moreover, the plaintiffs aver that, upon information and belief, all of the corporate defendants are either direct or indirect subsidiaries of defendant Parsons Corporation.  Further, throughout the Complaint the plaintiffs commonly refer to the corporate defendants collectively, instead of as individual entities.

2005); *Terminix Intern., Inc. v. Rice*, 904 So. 2d 1051 (Miss. 2004) (applying federal law). Moreover, once the non-signatory spouse attempts to receive a benefit deriving *from* the contract containing the arbitration agreement, then he or she may not disclaim the applicability of the arbitration clause to him or her.

Here, Mrs. Khan seeks to receive monetary redress for damages arising out of her husband's kidnaping on two grounds: (1) negligence; and (2) intentional infliction of emotional distress. Her claims for negligence are based upon an alleged breach of a duty owed to Mrs. Khan by the defendants. As the Complaint has not averred any other type of relationship between these two parties, any duty owed by the defendants to Mrs. Khan derives solely and directly from the employment contract signed by her husband. Accordingly, with respect to her claims of negligence, Mrs. Khan is estopped from avoiding arbitration on those claims, and must be submitted to arbitration pursuant to the terms set forth in the arbitration agreement in her husband's employment contract.

Mrs. Khan's intentional infliction of emotional distress claims do not derive from a breach of any duty owed to her that is related to the employment agreement. Intentional infliction of emotional distress claims do not include a breach of duty element. Therefore, the Court must now assess the merits of Mrs. Khan's intentional infliction of emotional distress claims against the defendants separately.

D.     *Mrs. Khan's Intentional Infliction of Emotional Distress Claims*

To recover damages for the tort of intentional infliction of emotional distress, the plaintiff must show "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Darrow v.*

21

*Dillingham & Murphy, LLP*, 902 A.2d 135, 139 (D.C. 2006) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)).  Mrs. Khan claims that the defendants' relayed inconsistent and untrue statements to her during the period when her husband's release was being secured, and that they directed Mrs. Khan to continue to speak with her husband's kidnappers, while not giving her the details of the ransom amounts.  Mrs. Khan asserts that defendants' conduct caused her to continue to be "made aware of the continued kidnaping, physical and emotional distress and torture, and eventual mutilation of Mr. Khan." Compl. ¶ 89.  As a result, Mrs. Khan alleges she suffered severe emotional distress.

Upon review of the Complaint, however, the Court finds that Mrs. Khan's claim of intentional infliction of emotional distress must be dismissed because the defendants' actions in securing Mr. Khan's release were not extreme or outrageous enough to warrant a finding of liability, nor were they done with the intent to cause or reckless disregard of a risk that Mrs. Khan might suffer severe emotional distress.  Even assuming all averments in the complaint as true, it is important to consider the defendants' actions within the context of the situation at hand. Mr. Khan was being held by criminals for ransom.  Such a situation is one that would obviously incite severe emotional distress and high anxiety.  And there is no evidence that this situation was caused either directly or indirectly by the defendants.  It was caused by Mr. Khan's captors, whoever they are.  Rather than cause the anxiety, the defendants were simply trying to diffuse the situation, doing whatever they could *to secure his release* in the midst of such a highly stressful incident.

Moreover, defendants were not obligated to tell Mrs. Khan anything about the amount of money they were willing to pay Mr. Khan's captors, as they were the ones negotiating, not Mrs.

Khan.  Negotiating with kidnappers is both risky and unpredictable.  It is best left in the hands of those with experience.  Defendants allegedly had such experience.  Based on this experience, it is certainly reasonable–if not probable–for defendants to have concluded that telling Mrs. Khan information about the ransom amount could have *further* jeopardized her husband's situation, because it would have put his captors in a position where they held both Mr. Khan *and* all the information.  Therefore, though the defendants' failure to divulge this information to Mrs. Khan may have caused her additional distress, the Court finds that the defendants' actions were certainly reasonable under the highly stressful circumstances of an overseas hostage negotiation.

Still, Mrs. Khan complains that defendants compelled her to speak on the phone with her husband and his captors, and that this conduct was outrageous because it continued to make her aware of the kidnaping.  First, the defendants are not to blame for her having to talk with her husband.  Rather, all evidence in the Complaint points to the fact that *Mr. Khan* called Mrs. Khan in each phone conversation between them.  It is simply a natural outgrowth of an unfortunate and highly stressful situation in which the plaintiffs were caught.   Second, Mrs. Khan's argument that the *defendant's* actions continued to make her aware of the kidnaping is disingenuous.  As if miraculously, by not speaking on the phone, the situation would have resolved itself, and Mrs. Khan would be free from worry and stress resulting from her husband's kidnaping.

Though this Court does not doubt the severity of the emotional distress that Mrs. Khan must have endured to know that her husband was being held by captors in a foreign country, it cannot allow her to place blame on and seek redress from those parties who made good faith and earnest attempts to secure Mr. Khan's release.  The defendants' actions were far from outrageous.  They were earnest attempts to safely secure the release of one of their employees.  Therefore, the

23

Court finds that Mrs. Khan's claims for intentional infliction of emotional distress must be DISMISSED WITH PREJUDICE.

      E.       *Status of Plaintiffs' Discovery Requests*

Plaintiffs have made two discovery requests seeking information that might bear on both the merits of the substantive claims at issue, and whether the arbitration clause is unconscionable. In light of this Court's finding that the plaintiffs' claims either must be submitted to arbitration pursuant to the arbitration agreement entered into by the parties or must be dismissed, the Court finds that it no longer has jurisdiction over these claims to compel plaintiffs' requests for discovery. The proper venue for making such discovery requests now rests with the arbitrator. Therefore, the Court DENIES plaintiffs' discovery requests.


A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, March 30, 2007.